Before we begin, I think it would help if both counsel will address the jurisdictional issue raised by the 28J letters and the timing of exhaustion and filing. You may proceed. Good morning. May it please the Court, my name is Karen Stafford on behalf of the appellant Stephen Morales, Nicole Perry, and Chopper 2, LLC. To answer your question about the jurisdictional question, this was raised for the first time by the government just a few days before today, like you said, in the Rule 28J letter. The argument is that somehow there's not jurisdiction because the suit was commenced prematurely. The response to that, and I trust that the Court received a response to that, is that the notice of claim was submitted in January, and then the government issued a formal written denial on July 30th. On August 1st or 4th, excuse me, the very beginning of August, the appellant then served that lawsuit and commenced proceedings. Prior to the service of that lawsuit, the government was not even aware that a lawsuit had been filed. The lawsuit could have been withdrawn at any time prior to its service, and there's some case law that was cited to the Court that under this particular statute, commencement of a suit requires the accomplishment of service, of process. And that's what happened here. This argument has never been raised, either to the district court or in its briefings to this Court. Well, I did think it's extraordinary, and, you know, depending on where it sorts out that the government, which it says was asleep at the wheel and forgot to notice this at the outset in the district court and in the Court of Appeals until days before argument, so that's a very unusual situation. The question then is, is the premature filing, is that actually the fixed date as opposed to service? The filing versus the service. And your position is the service is the effective date, and the government's position is the filing is the effective date, correct? I assume that's the government's position, although it's not really been articulated until now. The reason that our position is, is that the service affects commencement of the lawsuit is that there's no requirement for the government to appear for litigation to even ensue until service of process is accomplished. No deadlines arise. Nothing happens until the lawsuit is served. They denied your claim without saying, we're denying your claim because we haven't had a chance to consider it or because it's premature or anything of that sort, right? That's absolutely correct. And, in fact, it's abundantly clear that the government, they weren't aware of the lawsuit because it hadn't been served. They had an abundant amount of time to consider and evaluate the claim, which is the purpose of the six-month window of time, is so that the government can determine whether or not there could be settlement, perhaps. The government had ample time for that. The purpose of this statute was accomplished. And I will say that the jurisdictional requirement was met here because we — the appellants filed a notice of claim, and there, under the statute, now vests jurisdiction  I would ask that if the Court were to consider any action on this basis that it would allow for further briefing, since this was something that the appellants have not been able to really consider deeply. Sure. We understand that. Thank you.  We're going to get to the main arguments now, and I'd like to reserve four minutes for rebuttal, if that's all right. The cableway — the USGS stream-gaging cableways at issue in this case, or the cableway at issue in this case, is not marked. It's important for the Court to know that it was not marked with any aerial markers. It wasn't identified on any map available to pilots, including the USGS hazard map. And they were — these cables are admittedly invisible to pilots. As early as 1984, the government knew that these stream-gaging cables were invisible and were killing people. And there had been an alarming amount of deadly fatal accidents that had occurred prior to this particular accident, and even prior to 1984, when it first issued its policy to do something to mark these cableways. Can the government know that a hazardous condition exists and make a discretionary decision not to mark it or not to do anything about it for whatever reason? Can they do that? I think our case law in the Ninth Circuit is clear that when the government not only knows of a hazard — in this case, a deadly hazard — but it also created the hazard, it cannot then hide behind policy to not properly warn the public of the hazard and protect public safety. And there's a number of cases that stand for this proposition. The most recent pronouncement of that is Young v. the United States. And that was decided in 2014. It's directly on point because it's a failure to warn case about a hazard that was created by the government, that the government knew about, but failed to warn the public about. And Young held that there cannot be a reliance on policy, that public safety is not susceptible to a valid policy analysis under the discretionary function exception. So then essentially there is no discretionary function exception. Well, there is a discretionary function exception when the judgment required by the government would be that that is required by the ordinary private person. And I'm sorry, that's when there is a waiver of — excuse me — of liability. When that judgment is uniquely governmental, then there is an exception, and that the government is able to exercise discretion and to weigh policy considerations. That's not the case here. For example, Young distinguished a number of cases in which the National Park Service was required to weigh policy considerations of conservation, public safety, when it identifies natural hazards that exist in its parks. And in those cases, the courts found that the government is able to exercise its discretion and weigh those policy considerations because it would be unrealistic for the government to identify every potential hazard that exists in the wild. But the case is different when the government not only knew of a hazard, but created it, put it out there, and then fails to ensure that the public is safe from it. And that — the Young case relied on a very long line. Doesn't that, however, just fly in the face of the whole point of the discretionary function exception? In other words, it's forcing the government to make a decision in a given way about a given hazard that they may decide that they don't want to exercise their discretion in that way. Well, the discretionary function exception is meant to be construed narrowly. The Federal Tort Claims Act is a remedial statute that's meant to be construed broadly, and it's meant to hold the government liable for conduct that an ordinary private citizen would ultimately be held liable for. So in looking and construing the exception narrowly, it would be — it would eviscerate the entire Federal Tort Claims Act, the purpose of it, to allow the government to hide — always hide behind every action it takes, like in this case, allowing invisible cableways to be erected bolted in the side of canyon walls for the purpose of blending in with the surroundings and ignoring an alarming trend of fatal accidents that had occurred. Could we step back to the structure that we're asked to employ in these cases? Can you point to any mandatory directive? Yes. So the bulk of our argument has been devoted to what I think you're referring to is Step 2 of the Berkowitz test. But there are two steps. And Step 1 — No, Step 1 is what I'm referring to. Yes, thank you. Step 1 of the Berkowitz test asks, is there some mandatory policy or statute in place that would prevent any exercise of discretion? Here, I would argue that the answer to that is yes. For over a decade, the USGS had a policy for each district to evaluate its stream gauging cables, determine whether or not they were hazardous, and then erect — install aerial marking balls. Here, this particular cable was evaluated and it determined on multiple occasions that it required aerial marking balls, and yet none were installed. It wasn't until after a lawsuit was ensued in 1995, after the deadly cable strike accident, that the USGS decided to reexamine its policy at the advice of its lawyers and then implement a policy to basically do nothing to warn the public of these cableways. Well, so then the answer has to be there's — you can change policy over time or change directives, correct? Well, I would argue that the policy enacted into the year 2000 is not a valid policy, but even still, had the government followed its own mandatory — Well, in fact, what is your best support for that? I mean, otherwise, if we were to buy your argument, it would seem the government could never change a policy. Certainly the government can change a policy. I will point out that had the government followed its mandatory policy between 1984 and the year 2000, there would have been aerial markers on this particular cable. But in the year 2000, the policy implemented by the government, I would argue here, is not valid because it relies on FAA regulations that are wholly inapplicable to these structures, that aren't governed at all by the FAA. It also relies on kind of a list of these after-the-fact policy considerations that are found nowhere in any document in the USGS manual. There's — there's no evidence that the government actually weighed any of those policies when it determined to install aerial markers on this — on the replacement cable here or on any of its cables. But I think you just got us back to our original point, which is that apparently USGS did exercise its discretion and decided to change its policy that existed prior to 2000 to a new policy. And they can do that, right? In this case, the failure to warn the public of a deadly hazard it created, I don't believe it is within the government's discretion to create a policy to do nothing of — to warn the public of these deadly hazards that it created and it knew had killed people since 19 — since the 60s, actually. There had been 11 accidents that had occurred at that — before the accident that occurred in this case, 15 fatalities. So to change its policy to a purported policy of doing absolutely nothing, I don't believe that is within the government's discretion to enact a policy to just ignore public safety. And you don't — and you don't think that the case is more like Mitchell, where they're looking to the FAA policy or the FAA guidelines? This case is not like Mitchell for a couple of very important reasons. It's very factually distinct. The wires at issue in Mitchell were the Bonneville Power Administration wires, catenary wires. These particular structures and wires are subject to FAA guidance, very extensive FAA guidance. They're not mandatory regulations, but the FAA issued an advisory circle — circular, excuse me — with directives as to how to light and mark these wires very specifically. At the time that Mitchell was decided, ground wires were not required to be marked. But the pilot in that case was aware of the catenary wires next to it and was aware that these structures existed. And they were marked on maps. It's not the case here. The stream gauging cables at issue here are not governed by any guidance, any regulations by the FAA or by any entity, and they are not marked on any map. They're just — they're just — their existence is unknown to pilots, and they're invisible. So it would be impossible for them to be avoided. And I say I only have a couple of minutes left, so unless there's other questions, I can reserve the rest of my time for rebuttal. Thank you. Thank you. May it please the Court. Benjamin Schultz on behalf of the United States. I want to begin by apologizing to the Court that we did not recognize the jurisdictional timing issue until shortly before the argument. This was something that we wish we had seen earlier, and we express our regret and apologies to the Court that we did raise it so late. But having said that, I do want to spend a little bit of time on it, given Judge McKeown's direction to counsel. And I want to begin by talking about the service of process issue, because that very argument that the plaintiffs are making, that you don't measure the time based on the filing, you measure it based on the service of process, the First Circuit squarely rejected that in a published opinion called Barrett v. United States in 2006, and you can find that at 462 F. 3rd, 28, pages 36 to 37. And what the First Circuit correctly explained was they started with Federal Rule of Civil Procedure 3, which says a civil action is commenced by filing a complaint with the Court. And what 28 U.S.C. 2675a talks about is instituting an action. And the First Circuit said instituting an action means what Federal Rule of Civil Procedure 3 says, and it means filing a complaint. And I'll — I'm sorry. Robertson, can the government waive — waive that rule? I'm sorry. Can the government — Can you waive the rule of six — you know, the six-month waiting period? Unfortunately, Your Honor, under this Court's precedent, that rule is jurisdictional. But I will say that I don't think the Court needs to rule on the six-month basis in this case. The discretionary function exception is also jurisdictional. That's a different issue altogether. Right. But what I was trying to get at is when the government denied the claim, not on the basis that it was premature or not exhaustive, but on the merits, can the government just simply waive the six-month waiting period for the claim? Your Honor, that's a complicated question. The short answer is no, because it's jurisdictional. But the longer answer is that it's a little more complicated than that, because this lawsuit is prematurely filed and it's forever barred. There would be a question if plaintiffs filed a new lawsuit. That new lawsuit would not be premature. There might be other defenses to that new lawsuit, and we would have to determine whether that other lawsuit has other timeliness problems. Maybe there's res judicata problems. Those would all get resolved in that other lawsuit. I certainly don't want to be here saying that the other lawsuit would be fine, but whether a later lawsuit could be maintained that is not premature would have to be resolved in that later lawsuit. Your Honor, I also just very briefly on the timeliness issue, I just want to point out for the Court that it's my understanding that at the time that the government did its denial on July 30, 2014, my understanding, at least from agency counsels, that we were aware of this lawsuit despite not having been served, and it is, in fact, rather common in FTCA cases for the government to be aware of lawsuits before formal service. Sometimes that happens because the government monitors the docket. Sometimes that happens in high-profile cases if there's a media report. Sometimes we could be informally notified by counsel, including counsel, maybe it's counsel in a related lawsuit, or counsel might even informally tell us before service. So this is all to say that the government is not necessarily, is sometimes aware of a lawsuit before formal service. And you don't have, like, a little automatic checklist at DOJ that says, particularly in the agency context, jurisdiction, no jurisdiction, timely, administrative exhaustion. You have such a real simple sort of check in your agency in the trial court or otherwise. Your Honor, let me express my apologies again to the Court that we did not notice this. The complaint alleges that they waited six months. The opening brief on appeal alleges that six months passed from filing with the agency and filing with the Court. That is what it says. We should have calculated that. And when we did calculate it and noticed it, we noticed that it was not six months. And all we can do is apologize to the Court and raise it now because this Court has held it as a jurisdictional issue. Thank you. Having said that, if I could turn to the discretionary function exception. We think this case is a straightforward case, and it can be resolved on any of three grounds. First, the Court could just resolve this because this case is like Mitchell. In Mitchell, this Court held that an agency's decision to defer to the airspace expertise of the Federal Aviation Administration is a decision that is itself a policy-based decision, and that resolved this case. In addition, the Court could resolve the case on the basis that counterbalancing safety considerations also are valid to invoke the discretionary function exception. Here, the government — here, USGS talked to the FAA, and the FAA told it that not only should these cables not be marked, but that doing so could even confuse pilots who expect to see warning markers only at higher altitudes, at higher elevations. Furthermore, the government had a declaration that explained that installing these warner — warning markers can become target for marksmen, who can cause undetected damage to the cableways, which could jeopardize the safety of USGS employees who use these cableways to suspend themselves over rivers. And there's also other employee safety considerations. Well, counsel's key point, I think, was that the FAA does not really have jurisdiction, per se, over this type of fixed cable, and so you aren't really deferring to the FAA, so I would appreciate if you would respond to that. Sure, yeah. The short answer is counsel is flatly wrong about that, and if you read the regulations, you'll see that they absolutely apply here. There's nothing about the FAA's published regulations that in any way say that they don't apply to USGS wires. What counsel is actually referring to is a 2015 FAA advisory guidance document. That's not an FAA regulation. That's not the Part 77 regulations that this Court invoked in Mitchell. It's an FAA guidance document, and as we explain in our brief, that guidance document, by its terms, not only applies to power lines, but it also applies to non-energized catenary wires, which are wires which are maintained at a defined tension. So even if you thought that the advisory guidelines, which are not in Part 77, somehow had relevance to this case, there's no relevant distinction here between power lines such that were at issue in Mitchell and other non-energized catenary wires. But, Your Honor, I think the more important point here is to look at what it was that this Court analyzed in Mitchell, and what the Court did in Mitchell was it cited FAA's Part 77 regulations. It didn't cite a 2015 advisory guidance. It said Part 77 regulations. And those Part 77 regulations at the time of the accident in Mitchell in 1980 and the Part 77 regulations as they are in effect today are similar in all relevant respects, in that certain structures below an altitude are not deemed a hazard to air navigation, except in certain narrow circumstances, none of which are applicable here. I'll also add, Your Honor, that the actual basis for why Mitchell thought that deferring to the FAA involved policy judgment was because Mitchell recognized that allocation of expertise between and among Federal agencies is itself something that is a policy-based decision. And here you have even more than the deference that you have in Mitchell, because here you have evidence that USGS, when it reevaluated its policy in 2000, it didn't just look to the FAA regulations. It actually called someone from FAA. It sat down at a meeting and said, Hey, we're thinking about marking all of our cables nationwide. Is that a good idea? And the FAA said, Don't do that. That's a bad idea. Your well-intentioned efforts could actually interfere with our nationwide scheme and could be hazardous because pilots could get confused. And in FAA's view, that was something that did not contribute to airspace safety. And it's... With these invisible wires, is there any warning anywhere? Forget marking the cables. Is there some other warning? Your Honor, I'm not aware of a warning about the cables, but there was evidence presented in this case that this particular area of the Verde River was actually a bald eagle nesting area, and that fact was noted on maps. And because it was a bald eagle nesting area, there was evidence that flights were not expected for that reason. But regardless, Your Honor, I think, you know, the fact that this was a narrow river canyon, that just, first of all, feeds into our scenic integrity point, which is that if plaintiff's argument is that this should have been highly visible, this should have had bright orange warning markers so everyone could see it, that was completely inconsistent with the scenic corridor. Congress had designated this area of the Verde River as a wild and scenic river, and it directed the Forest Service to have a management plan, and that management plan said that in this area of the Verde River, man-made structures should be designed to blend in with the natural setting to the greatest extent possible. And consistent with that management plan that the Forest Service had enacted, the existing cableway at the time of the accident did largely blend in with the natural setting. Now, one could say that, well, maybe a different decision should have been made. Maybe there should have been bright orange warning markers. But the discretionary function exception applies by Congress's direction in the text of the statute whether or not that discretion be abused. And here, the agency had another countervailing policy consideration, scenic integrity and scenic access, and it balanced that against safety considerations. And under this Court's case law, that is sufficient to invoke the discretionary function exception. And, indeed, whether or not the agency even sat down and balanced it, this Court's case law says that all that the agency has to show is that it was susceptible to balancing, and it was clearly susceptible here. If there are no further questions, we'll rest on our briefs. But I would be happy to answer any other questions that the Court has. MS. GOTTLIEB Here's not. Thank you. MR. GARGANO Thank you. MS. GOTTLIEB I'd just like to address a couple of comments very quickly. First of all, it should be noted that the replacement cable that was erected after this accident was fitted with aerial marking balls, those bright orange balls. There's no evidence in the record that the government weighed any of those considerations that were discussed just now, scenic integrity, vandalism, pilot confusion. None of those things were considered when putting the replacement cable up and installing it with the aerial marking balls. I will also say that the canyon is not narrow. It is, first of all, very broad. And as early as 1989, in its first annual inspection, the government recognized that this is an area that likely needs warnings because it's frequented by helicopter flight. And it's not just MS. GOTTLIEB It's like 290 feet across, more or less. MS. GOTTLIEB I'm sorry?  GOTTLIEB It's about 290 feet. MS. GOTTLIEB Yes. It stretches. And it's about an inch in diameter. Again, bolted directly to the side of the canyon walls. Virtually, well, admittedly invisible to pilots. This, in 1989, excuse me, in 1984, the government recognized that there are, in fact, were no FAA regulations that govern these structures. So to defer to the FAA, who the government has called the experts in this area, is disingenuous. Because a decade earlier, two decades earlier, it acknowledged in its own documents that because there were no FAA regulations or guidance that govern these structures, a policy was needed to protect pilot safety, not just visitors. MS. GOTTLIEB Is there anywhere in the record that shows what the typical flight altitude would be of these Scenic or other helicopters? MS. GOTTLIEB Well, helicopters are permitted to fly at any altitude, unlike other aircraft. MS. GOTTLIEB I understand that. But is there anything in the record about what, where they're flying in this vicinity? MS. GOTTLIEB Well, I'm not sure that there's anything  But I do know that in the record, there is a lot of discussion in the government. MS. GOTTLIEB Well, we know they can fly at any altitude because they land. MS. GOTTLIEB And the government, in fact, many of the fatalities that have occurred prior to this accident were government's own employees. Because of search and rescue missions and other types of missions that require very low-level flight, like water dipping, logging missions, things of that nature, it's not just Scenic flights that are at risk. It's the government's own employees. MS. GOTTLIEB But is there anything in the record that talks about what a pilot's obligation is to determine the safety of where he or she is flying his or her aircraft? MS. GOTTLIEB Well, what is in the record is that there is nothing for pilots to look towards to see where these cables are. So there would be no way to know or expect where they are if you can't see them. You can't avoid what you can't see. And you certainly can't avoid it if it's not marked on any map. The point is, is that the argument that the balls might create pilot confusion is a strange argument because a pilot would naturally avoid a cable that's clearly marked, even if it was temporarily confused about why that marker existed. But that confusion would not cause death. Leaving the cables completely unmarked would certainly cause death because these accidents result in death, absolutely. They're fatal. And if you can't avoid them, and you can't find where they're located on a map, and the government has continued to allow to erect these invisible cables. MR. HESSLER Let me just give you an example, though. There are power lines everywhere. And not all power lines are marked. So doesn't a pilot have an obligation to ascertain whether or not where he or she is going to be flying that aircraft is safe before they fly down to a certain altitude? MS. MCGREGOR Well, I would say that power lines generally are marked in aeronautical charts available to pilots. And the FAA does govern certain structures, like the catenary wires that were at issue at Mitchell. And that guidance does direct the private citizen, like APS and the Britain v. APS case in Arizona case, which held APS liable for not marking its power lines. The FAA does provide guidance for those types of wires. And also, those wires are bolted to large, obvious structures, not to the sides of canyon walls for the very purpose of blending in with the surroundings. But the MS. HESSLER Thank you. MS. MCGREGOR Okay. MS. HESSLER Thank you. MS. MCGREGOR Thank you. MS. MCGREGOR We've got that part of the argument well in mind. I appreciate your argument, as well as that of the government. Morales v. United States is submitted.
judges: Fernandez, McKeown, Benitez